# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| **TYRONE L. SPEARS,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  4:20-cv-01574 MHH** |
| | } | |
| **ANDREW SAUL,** | } | |
| **Acting Commissioner of the** | } | |
| **Social Security Administration,** | } | |
| | } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OPINION</u>

Tyrone Spears has asked the Court to review a final adverse decision of the Commissioner of Social Security.  The Commissioner denied Mr. Spears's claims for a period of disability and disability insurance benefits and supplemental security income based on an Administrative Law Judge's finding that Mr. Spears was not disabled.  (Doc. 9-3, pp. 18-39).  Mr. Spears argues that the Administrative Law Judge—the ALJ—erred in finding that Mr. Spears's migraine headaches and fibromyalgia were non-severe impairments.  (Doc. 12, pp. 16-20).  Mr. Spears also argues that the ALJ failed to consider relevant medical opinions and the VA's disability determination.  (Doc. 12, pp. 20-24).  The Court examines these arguments in this opinion.

## LEGAL STANDARD FOR DISABILITY AND SSI

To succeed in his administrative proceedings, Mr. Spears had to prove that he was disabled. *Gaskin v. Comm'r of Soc. Sec.*, 533 Fed. Appx. 929, 930 (11th Cir. 2013). "A claimant is disabled if he is unable to engage in substantial gainful activity by reason of a medically-determinable impairment that can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months." 42 U.S.C. § 423(d)(1)(A)).[1] A claimant must prove that he is disabled. *Gaskin*, 533 Fed. Appx. at 930 (citing *Ellison v. Barnhart,* 355 F.3d 1272, 1276 (11th Cir. 2003)).

To determine whether a claimant has proven that he is disabled, an ALJ follows a five-step sequential evaluation process. The ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant

---

[1] Title II of the Social Security Act governs applications for benefits under the Social Security Administration's disability insurance program. Title XVI of the Act governs applications for Supplemental Security Income or SSI. "For all individuals applying for disability benefits under title II, and for adults applying under title XVI, the definition of disability is the same." https://www.ssa.gov/disability/professionals/bluebook/general-info.htm (lasted visited February 7, 2023).

can perform given the claimant's RFC, age, education, and work experience.

*Winschel v. Comm'r of Soc. Sec. Admin*, 631 F.3d 116, 1178 (11th Cir. 2011). "The claimant has the burden of proof with respect to the first four steps." *Wright v. Comm'r of Soc. Sec.*, 327 Fed. Appx. 135, 136-37 (11th Cir. 2009). "Under the fifth step, the burden shifts to the Commissioner to show that the claimant can perform other jobs that exist in the national economy." *Wright*, 327 Fed. Appx. at 137.

## ADMINISTRATIVE PROCEEDINGS

Mr. Spears applied for disability insurance benefits and supplemental security income on October 16, 2017. (Doc. 9-7, p. 2). Mr. Spears alleges that his disability began on September 30, 2016. (Doc. 9-7, p. 2). The Commissioner initially denied Mr. Spears's claims. (Doc. 9-6, pp. 2-4). Mr. Spears requested a hearing before an Administrative Law Judge. Mr. Spears appeared at the hearing on June 25, 2019; his attorney attended the hearing too. (Doc. 9-4, p. 4). A vocational expert testified at the hearing. (Doc. 9-4, pp. 51-56). After the hearing, the ALJ submitted written questions to the vocational expert, seeking clarification of the testimony she gave at the June 2019 hearing. (Doc. 9-8, pp. 97-99). Mr. Spears also submitted written questions to the vocational expert after the administrative hearing. (Doc. 9-8, pp. 108-10). To allow Mr. Spears to present his questions to the vocational expert in

person, the ALJ held a supplemental hearing on March 19, 2020. (Doc. 9-3, pp. 45-65).

The ALJ issued an unfavorable decision on May 6, 2020. (Doc. 9-3, pp. 15-39). On August 13, 2020, the Appeals Council declined Mr. Spears's request for review (Doc. 9-3, p. 2), making the Commissioner's decision final and a proper candidate for this Court's judicial review. *See* 42 U.S.C. § 405(g).

## EVIDENCE IN THE ADMINISTRATIVE RECORD

### *Mr. Spears's Medical Records*

To support his application, Mr. Spears submitted medical records that relate to the diagnoses and treatment of osteoarthritis of the lumbar spine, irritable bowel syndrome, obesity, diabetes, kidney disease, sleep apnea, depression, post-traumatic stress disorder, fibromyalgia, migraine headaches, asthma, gout, hypertension, and hyperlipidemia. Mr. Spears challenges the ALJ's findings regarding his traumatic brain injury, migraine headaches, and fibromyalgia and the ALJ's treatment of opinion evidence from the VA Hospital and Dr. Calvin Harris, Mr. Spears's psychiatrist. The following medical records are most relevant to Mr. Spears's arguments for relief from the ALJ's decision.

### *Headaches and Traumatic Brain Injury (TBI)*

Mr. Spears's records concerning his diagnosis of TBI and migraine headaches date to August of 2016. On August 13, 2016, Mr. Spears visited the Crestwood

4

Medical Center Emergency Department; he complained of "pain to the right base of the skull." (Doc. 9-9, p. 168). Mr. Spears reported that he had experienced migraine headaches for a week and that he had been out of blood pressure medication for more than 30 days. (Doc. 9-9, p. 173). Mr. Spears rated his pain as 8/10 and his blood pressure was 209/156. (Doc. 9-9, p. 175). Mr. Spears reported associated symptoms of nausea, neck stiffness, sinus tenderness, and vomiting. (Doc. 9-9, p. 168). Mr. Spears reported that he had a history of headaches and stated that the headaches he had experienced over the preceding seven days were more severe than past headaches. (Doc. 9-9, p. 168). Mr. Spears reported that to alleviate his symptoms, he would sit in a dark room and take over-the-counter medication. (Doc. 9-9, p. 168). Mr. Spears was diagnosed with hypertensive headaches, and he received a prescription for Lisinopril, his blood pressure medication. (Doc. 9-9, pp. 171-72).

In December of 2017, Mr. Spears's primary care physician, Dr. Rani Gill, ordered a CT scan because of Mr. Spears's uncontrolled blood pressure and complaints of headaches. (Doc. 9-11, pp. 5, 54). The scan showed "no evidence of hemorrhage, mass or extra-axial fluid collection." (Doc. 9-11, p. 5). The radiologist noted that, for his age, Mr. Spears's ventricles were mildly prominent in comparison to the sulci, and Mr. Spears's sylvian fissures were dilated. (Doc. 9-11, p. 5). Because Mr. Spears's ventricles were mildly prominent, the radiologist

recommended an evaluation for early normal pressure hydrocephalus. (Doc. 9-11, p. 6).

In February of 2018, Dr. Gill referred Mr. Spears to a neurologist for a consultation. (Doc. 9-11, p. 38). Mr. Spears reported that he was having headaches daily and that he had tried taking Imitrex and Topamax to relieve his headache symptoms. (Doc. 9-11, p. 38). Dr. Gill asked Mr. Spears to schedule an appointment with Dr. Adeel Memon. (Doc. 9-11, p. 39).

During his visit with Dr. Memon, Mr. Spears reported that he was hit in the head during his service in the Iraq war. Mr. Spears explained that he was:

> hit at the top of his head. He did not loss [*sic*] consciousness but he was "zonked out" for at[]least 30 minutes. Since then[,] he started having headaches. He describes his headaches as throbbing in nature, bilaterally on the temporal and occipital region. It is associated with nausea, vomiting, photophobia, and phonophobia. At times they are also associated with rhinorrhea, lacrimation bilaterally. It lasts for at[]least a few hours and at times days. He has some benefits from [E]xcedrin which he takes at[]least 3-4 times per week. He is disabled now because of his health issues and has stopped working since last year. He tries to go to bed around 9:30-10pm. He has to wake up in the middle of the night to go to the restroom multiple times. Also[,] he has OSA and uses CPAP most of the time. The reason for not using it daily is that it causes dryness in his nose, which causes nose bleed. No other neurological symptoms/complaints at this time.

(Doc. 9-11, pp. 55-56). Dr. Memon indicated that Mr. Spears was awake, alert, and oriented and that his cranial nerve findings were normal. (Doc. 9-11, p. 57). Dr. Memon noted that Mr. Spears's headaches were suggestive of migraines, and he gave Mr. Spears prescriptions for sumatriptan to be used no more than nine times

per month and Topamax to take daily.  Dr. Memon advised Mr. Spears to stop taking Excedrin.  (Doc. 9-11, p. 58).  Dr. Memon referred Mr. Spears for a greater occipital nerve block.  (Doc. 9-11, p. 59).

On March 15, 2018, Mr. Spears had a routine follow up for his chronic medical conditions with Dr. Gill.  Mr. Spears reported no severe headaches. (Doc. 9-11, p. 170).  On February 28, 2019, Mr. Spears saw Dr. Gill again.  (Doc. 9-11, p. 85).  Mr. Spears was experiencing headaches.  Dr. Gill ordered a head CT and a re-consult with a VA neurologist.  Dr. Gill questioned Mr. Spears's adherence to his medication. (Doc. 9-11, p. 87).  Mr. Spears's stage 3 kidney disease impacted his ability to use some medications.  (Doc. 9-11, pp. 85, 87).

*Fibromyalgia*

On February 28, 2017, Mr. Spears visited Dr. Isabel Baren for a VA Compensation and Pension exam and a Disability Benefits Questionnaire—DBQ. (Doc. 9-12, p. 72).  Dr. Baren examined Mr. Spears and reviewed his virtual claims folder and patient records.  (Doc. 9-12, p. 72).  Dr. Baren noted that Mr. Spears was diagnosed with fibromyalgia in 2013.  (Doc. 9-12, p. 73).  Dr. Baren indicated that Mr. Spears had reported body aches and muscle pain since basic training and that his condition deteriorated in 2003 when he returned from the Middle East.  Mr. Spears reported fatigue and daily headaches that lasted three to four hours.  Mr.

Spears reported pain and stiffness in his arms, legs, neck, and back. (Doc. 9-12, p. 73).

Dr. Baren indicated that Mr. Spears was not receiving treatment for his fibromyalgia and that he did not require continuous medication to control his symptoms. (Doc. 9-12, pp. 73-74). Based on her examination, Dr. Baren determined that Mr. Spears had positive tender points bilaterally in all areas and that he experienced constant or nearly constant widespread musculoskeletal pain, stiffness, and fatigue. (Doc. 9-12, p. 74). Dr. Baren indicated that Mr. Spears's fibromyalgia did not impact his ability to work. (Doc. 9-12, p. 75). Lastly, Dr. Baren noted that Mr. Spears reported that his PTSD caused poor sleep because of nightmares, anxiety, and depression. (Doc. 9-9, p. 43; Doc. 9-12, p. 75).

On November 20, 2017, Dr. E.L. Mollohan examined Mr. Spears for a disability determination. (Doc. 9-9, p. 157). Mr. Spears complained of fibromyalgia, multiple mood disorders, and lumbar radiculopathy. (Doc. 9-9, p. 157). Regarding his fibromyalgia, Mr. Spears reported that his pain was a 7/10 at best and a 9/10 at worst. Mr. Spears described his pain as numbness and tingling down both arms and legs and down the cervical, thoracic, and lumbar spine. (Doc. 9-9, p. 157). Mr. Spears reported that he experienced burning, popping, cramping muscle spasms and soreness to the touch. (Doc. 9-9, p. 157). Mr. Spears stated that

stretching and changing positions helped to relieve his pain while gripping, lifting more than five pounds, and weather changes aggravated his pain. (Doc. 9-9, p. 157).

Mr. Spears reported that he was experiencing panic attacks, mood swings, sweaty nightmares, auditory hallucinations, and easy agitation. (Doc. 9-9, p. 157). Mr. Spears was using medication, isolation, and therapy to help relieve his symptoms. Loud noises, crowds, social interactions, and stress aggravated his symptoms. (Doc. 9-9, p. 157).

Mr. Spears reported that his back pain was 5/10 at best and 8/10 at worst. (Doc. 9-9, p. 157). Mr. Spears described his pain as dull to sharp, burning, popping, and cramping with muscle spasms, weakness, numbness, and tingling. (Doc. 9-9, p. 157). Mr. Spears reported that stretches, having his kids walk on his back, and changing positions helped to relieve his pain. Mr. Spears stated that his pain was worse with bending, lifting more than ten pounds, sitting more than fifteen minutes, standing more than 30 minutes, walking with more than five pounds, weather changes, and lying flat. (Doc. 9-9, p. 158).

During the physical exam, Mr. Spears exhibited an antalgic gait; bilateral hip, foot, and knee pain; decreased sensation to touch; and positive tender point testing. (Doc. 9-9, p. 159). Mr. Spears "could sit and/or stand for at least 30 minutes without complaints during the exam. [Mr. Spears] was able to stand up from a seated position and get on/off the examination table without difficulty." (Doc. 9-9, p. 160).

Dr. Mollohan noted that Mr. Spears complained of generalized musculoskeletal soreness, exhibiting 16 of the 18 palpable muscular tender points, consistent with the criteria for diagnosis of fibromyalgia.  (Doc. 9-9, p. 159).  Dr. Mollohan's impression was that Mr. Spears's exam findings were consistent with his complaints except that Mr. Spears did not complain of lumbar radicular pain with the exam testing maneuvers.  (Doc. 9-9, p. 160).  Dr. Mollohan noted that his findings were consistent with hypertension, fibromyalgia, mood disorder, mechanical lumbar back pain, type 2 diabetes, generalized osteoarthritis, morbid obesity, and peripheral neuropathy of the right upper extremity.  (Doc. 9-9, p. 160).

*PTSD and Depression*

On August 25, 2016, Mr. Spears visited Dr. Calvin Harris, a psychiatrist at the Huntsville VA Clinic.  Mr. Spears explained that he was 40 years old, he had PTSD, and he needed to establish care in Huntsville because he had just moved from Atlanta.  (Doc. 9-12, pp. 113, 117).  Dr. Harris evaluated Mr. Spears for PTSD and depression.  (Doc. 9-12, pp. 117, 119).  Mr. Spears reported nightmares, insomnia, hypervigilance, and detachment.  (Doc. 9-12, pp. 115, 117).  Mr. Spears was working as a security officer.  (Doc. 9-12, p. 117).  Notes from the visit indicate that Mr. Spears was not diagnosed with TBI during his service in Iraq, but there was an incident in which he hit his head on the roof of the vehicle in which he was riding.

10

(Doc. 9-12, pp. 115-17).  Dr. Harris prescribed Ambien and Effexor and referred Mr. Spears to Dr. Burleson for counseling for PTSD.  (Doc. 9-12, p. 119).

On December 7, 2016, Mr. Spears visited Dr. Harris for a follow up appointment.  (Doc 9-9, p. 106).  Mr. Spears reported that he was feeling fair and that "low frustration tolerance contributed to him resigning from his job."  (Doc. 9-9, p. 106).  Mr. Spears also reported mild insomnia and nightmares, but he indicated that his sleep improved with Ambien.  (Doc. 9-9, pp. 106, 108).  Dr. Harris noted that Mr. Spears's mood was dysphoric, his affect was constricted, and his thought processes were logical and goal-directed.  Mr. Spears reported no auditory or visual hallucinations and no suicidal or homicidal hallucinations.  (Doc. 9-9, p. 109).  Dr. Harris instructed Mr. Spears to continue Ambien, Effexor, and individual therapy. (Doc. 9-9, p. 109).

On March 24, 2017, Mr. Spears visited Dr. Harris again.  (Doc. 9-9, p. 92). Mr. Spears reported periodic nightmares and sleep disturbances.  Mr. Spears also reported feelings of sadness, irritability, and lack of motivation.  Mr. Spears denied medication side effects and suicidal or homicidal ideations.  (Doc 9-9, p. 92). Dr. Harris noted that Mr. Spears had not been hospitalized for his mental health conditions and that Mr. Spears had no auditory or visual hallucinations.  Mr. Spears appeared dysphoric and constricted, but he was oriented, his thoughts were goal directed, and his insight and judgment were fair.  (Doc 9-9, p. 94).  Dr. Harris

maintained a diagnosis of chronic PTSD and Major Depressive Disorder, single episode, unspecified.  (Doc 9-9, p. 94).

Mr. Spears saw Dr. Harris again on August 3, 2017.  (Doc. 9-9, p. 56).  Mr. Spears reported that he felt calmer and less depressed.  (Doc. 9-9, p. 56).  Mr. Spears told Dr. Harris that he was receiving counseling from his pastor at church.  (Doc 9-9, p. 56).  Dr. Harris screened Mr. Spears for depression, and Mr. Spears's "score was 2 which is suggestive of no depression."  (Doc. 9-9, p. 60).

Mr. Spears called Dr. Harris's office in October 2017 to request a consultation for a service dog.  (Doc. 9-12, p. 29).  A nurse gave Mr. Spears information on how to apply for a service dog.  (Doc. 9-12, p. 29).

During a visit with Dr. Harris on December 12, 2017, Mr. Spears reported "stress related to issues with his daughters and the community."  (Doc. 9-12, p. 22).  Mr. Spears reported that his anxiety and nightmares had increased, but his depression was not severe.  (Doc. 9-12, p. 22).  Dr. Harris instructed Mr. Spears to continue his medication and therapy regimen and to follow up in four months.  (Doc. 9-12, p. 25).

When he visited Dr. Harris on April 17, 2018, Mr. Spears reported that he was improving and denied significant symptoms of depression.  Mr. Spears reported that he was sleeping well.  Mr. Spears was excited and anxious because he and his wife were buying a house.  (Doc. 9-11, p. 161).  Mr. Spears had a calm and appropriate affect, his thought processes were logical and goal-oriented, and he scored 0 on his

depression screen which was "suggestive of no depression." (Doc. 9-11, pp. 164-65).

After his visit, Mr. Spears told the patient care coordinator that he forgot to ask Dr. Harris to write a letter to the disability board to report that he (Mr. Spears) "could not continue working." (Doc. 9-11, p. 167). Mr. Spears explained that when he worked as a security officer, he had to "carry a weapon and he [was] uncomfortable with that responsibility." (Doc. 9-11, p. 167). Mr. Spears added that,

> due to his PTSD diagnosis, he "[was] not good" with authority figures, [had] a bad temperament [and was] paranoi[d] and delusional at times. Also stated he [had] nightmares of prior service events and [did] not know how he [might] respond to events, stated "I may say something off the wall and not be me."

(Doc. 9-11, p. 167).

During an August 17, 2018 visit with Dr. Harris, Mr. Spears reported periodic anger and irritability, but he denied severe depressive symptoms. (Doc. 9-11, p. 133). Mr. Spears explained that his physician wanted to decrease his dose of Effexor to see if doing so would improve his cognition, but the decreased dose might elevate his depression. (Doc. 9-11, p. 133). Dr. Harris instructed Mr. Spears to continue his medication, declined to adjust Mr. Spears's Effexor dosage, and asked Mr. Spears to return to the clinic in four months. (Doc. 9-11, p. 136).

When he saw Dr. Harris on November 30, 2018, Mr. Spears reported stress from financial problems. Dr. Harris noted that Mr. Spears had mild depressive

symptoms.  (Doc. 9-11, p. 113).  Dr. Harris indicated that Mr. Spears was attentive and cooperative with a euthymic mood and a calm and appropriate affect.  (Doc. 9-11, p. 116).  Dr. Harris asked Mr. Spears to continue Ambien, Effexor, and individual therapy and to return to the clinic in four months.  (Doc. 9-11, p. 116).

During his July 26, 2019 appointment with Dr. Harris, Mr. Spears reported stress related to family and finances.  (Doc. 9-14, p. 28).  Mr. Spears had been involved in an incident where someone mistakenly "pulled a weapon on him."  (Doc. 9-14, p. 28).  Mr. Spears reported a little sadness, but he denied suicidal and homicidal ideations.  He also denied delusions and hallucinations.  (Doc. 9-14 pp. 28, 30).

Mr. Spears saw Dr. Harris on September 27, 2019.  Mr. Spears reported stress due to a physical altercation.  (Doc. 9-13, p. 154).  Dr. Harris increased Mr. Spears's Effexor prescription, continued his Ambien, and asked him to return in four months. (Doc. 9-13, p. 157).

On June 13, 2018, August 10, 2018, December 7, 2018, and February 15, 2019, Mr. Spears visited the VA hospital to attend counseling sessions with Ashley Madry, a licensed social worker.  Mr. Spears complained of daily depression, irritability, short temperedness, anger, insomnia, night sweats, anxiety, hypervigilance, intrusive thoughts, flashbacks, and racing thoughts.  At many of the

sessions, Mr. Spears presented as dysphoric with a flat affect.  (Doc. 9-11, pp. 94-96, 107-108, 140-41, 149-50).

On June 13, 2018, Mr. Spears reported auditory hallucinations that were becoming more intense and frequent.  (Doc. 9-11, p. 149).  Ms. Madry described the hallucinations as "command hallucinations" that directed Mr. Spears to hurt himself or others.  Because of these hallucinations, Mr. Spears had removed firearms from his home.  (Doc. 9-11, p. 150).  Ten months later, Mr. Spears "adamantly denied" auditory hallucinations, and he reported that he felt called to ministry in his church. (Doc. 9-11, p. 141).  On February 15, 2019, Mr. Spears reported "dreams of someone coming after him."  (Doc. 9-11, p. 95).  The dreams caused hypervigilance.  (Doc. 9-11, p. 95).  At these visits, the social worker encouraged Mr. Spears to attend monthly counseling sessions.  (Doc. 9-11, pp. 98, 110, 144).[2]

### Opinion Evidence

Mr. Spears submitted records of his VA Disability Ratings from February 2010 through September 2019.  (Doc. 9-7, p. 56).  The VA determined that Mr. Spears was 100% disabled as of September 23, 2019.  (Doc. 9-7, p. 55).  Mr. Spears's previous disability ratings were 30% in 2010, 70% in 2012, 80% in 2016, and 90% in 2016.  (Doc. 9-7, p. 56).  The VA's disability ratings were based on a VA contract

---

[2] Mr. Spears missed counseling sessions on September 5, 2018 and October 2, 2018,   (Doc. 9-11, pp. 121, 125, ).

examination on September 23, 2019, VA treatment records from August 25, 2016

through February 19, 2020, and the Board of Veterans Affairs' Appeals Decision

from February 2020.  The Board of Veteran Affairs' decision elevated Mr. Spears's

rating to 100% because of an increase in the symptoms associated with his diagnosis

of unspecified depressive disorder with anxious distress.  The Board explained:

> [a]n evaluation of 100 percent is assigned whenever there is evidence
> of total occupational and social impairment due to such symptoms as:
> gross impairment in thought processes or communication; persistent
> delusions or hallucinations; grossly inappropriate behavior; persistent
> danger of hurting self or others; intermittent inability to perform
> activities of daily living (including maintenance of minimal personal
> hygiene); disorientation to time or place; memory loss for names of
> close relatives, own occupation, or own name.  (38 CFR 4.126, 38 CFR
> 4.130)

(Doc. 9-7, p. 58).

Mr. Spears also submitted opinion evidence about his ability to work from Dr.

Harris, his VA psychiatrist.  In a letter dated April 19, 2018, Dr. Harris wrote:

> To Whom It May Concern:
>
> Mr. Tyrone Spears is currently in treatment for [PTSD] and Depression.
> Due to the severity of these clinical disorders, he is felt to be disabled
> and unable to maintain employment.

(Doc. 9-9, p. 184).  Dr. Harris also completed a medical assessment form, but the

form is undated.  (Doc. 9-12, pp. 123-24).[3]  Dr. Harris indicated that Mr. Spears had

a moderate impairment to following work rules; functioning independently; and

---

[3] The ALJ inferred from Mr. Spears's medical records that Dr. Harris completed the questionnaire
in 2019.  (Doc. 9-3, p. 30).  The inference is sound.

understanding, remembering, and carrying out simple job instructions.  (Doc. 9-12, pp. 123-24).   Dr. Harris indicated that Mr. Spears was severely impaired in relating to co-workers; dealing with members of the public; using judgment; interacting with supervisors; dealing with work stresses; maintaining attention/concentration; and understanding, remembering, and carrying out detailed and complex job instructions.  (Doc. 9-12, pp. 123-24).

*Mr. Spears's Administrative Hearing*

At his June 25, 2019 administrative hearing, Mr. Spears was forty-three years old.  (Doc. 9-4, pp. 2, 10).  Mr. Spears had a GED and an associate degree in business management.  (Doc. 9-4, p. 10).

Mr. Spears's wife was a student who attended class three nights a week.  (Doc. 9-4, pp. 14, 29).  On evenings that his wife was in class, Mr. Spears took care of his children for one or two hours.  (Doc. 9-4, pp. 14-15, 28).  He generally supervised because his wife would have "ha[d] their dinner prepared and [the children were] old enough to bathe themselves."  (Doc. 9-4, p. 15).  Mr. Spears's youngest daughter was three years old.  (Doc. 9-4, p. 15).  Mr. Spears testified that he had not been able to pick his daughter up for approximately two years because of his fibromyalgia pain.  (Doc. 9-4, pp. 15-16).  One of Mr. Spears's sons has autism and is non-verbal.  (Doc. 9-4, p. 21).  Mr. Spears testified that his son was too heavy for him to handle.  (Doc. 9-4, p. 21).  Mr. Spears testified that his pastor and her husband helped him

care for his children once or twice a month.  (Doc. 9-4, p. 29).  Mr. Spears drove his children to and from school, helped them with homework, and participated in telephone conferences with their teachers.  (Doc. 9-4, pp. 42-43, 46-47).

Mr. Spears testified that he was able to dress himself, tie his shoes, and use the microwave to prepare food.  (Doc. 9-4, pp. 41-42).  Mr. Spears occasionally accompanied his wife to the grocery store, and he "trie[d] to walk around with her before [he had] to go and sit in the car."  (Doc. 9-4, p. 45).  Mr. Spears testified that he did not pay the bills.  (Doc. 9-4, p. 46).

Regarding migraines, Mr. Spears testified that he took Excedrin to treat his symptoms.  (Doc. 9-4, pp. 17, 45).  Mr. Spears stated that he had migraines "[a]bout seven times a week, probably once a day . . . [that] last[ed] about three to four hours at a time."  (Doc. 9-4, pp. 17, 30).  Mr. Spears explained that he could not move when he had a migraine, describing his headaches as "almost like paralysis."  (Doc. 9-4, pp. 17, 30).  When Mr. Spears had a migraine while he was watching his children, he received help from his twelve-year-old daughter.  (Doc. 9-4, p. 30).

With respect to TBI, Mr. Spears explained that he was injured when he hit a pothole as he was driving in a military truck in the desert.  He bounced from his seat and smashed his head against the ceiling of the vehicle.  Because the padding in his helmet was not in the proper position, Mr. Spears hit his head on the hard Kevlar of his helmet and the ceiling.  Mr. Spears explained that he was dazed, and he believes

he passed out for a minute because his sergeant had to grab the steering wheel. For months after the accident, Mr. Spears had "dizzy spells that would last from 15 to 20 minutes." (Doc. 9-4, p. 31). Mr. Spears testified that he still struggled with dizziness, explaining that he could experience dizziness from moving or bending over too quickly, getting up from a seated position too quickly, taking a fast step, or opening the door for his wife. (Doc. 9-4, pp. 31-32). Mr. Spears testified that he believed that x-rays taken at the VA showed that he had water on his brain. (Doc. 9-4, p. 31). Mr. Spears stated that he never had a drain or received treatment for his condition. (Doc. 9-4, p. 32).

As it relates to his PTSD, Mr. Spears explained that though he was a mechanic, he had to fight with the infantry and provide combat support. (Doc. 9-4, p. 12). Mr. Spears testified that he saw dead bodies, tragic incidents, and people who were shot and wounded. (Doc. 9-4, p. 12). Mr. Spears stated that his PTSD caused paranoia that in turn caused him to avoid large groups of people. (Doc. 9-4, pp. 12-13, 17, 19). Mr. Spears testified that he did exercises to help with his PTSD and took medication for depression, but neither helped. (Doc. 9-4, pp. 37, 39-40).

Mr. Spears testified that he experienced hallucinations. (Doc. 9-4, p. 35). Mr. Spears stated that "sometimes [his] vision [would get] blurry and [he] [had] a very faint like feeling that [came] over him." (Doc. 9-4, p. 35). He explained that he

occasionally saw objects or people that were not there, but he knew that the object or person was not truly present.  (Doc. 9-4, pp. 35-36).

Mr. Spears stated that he suffered from sleep apnea.  (Doc. 9-4, p. 18).  He used a CPAP and took several medications, but he stated that neither helped with his condition.  (Doc. 9-4, pp. 18, 33).  Mr. Spears believed that his sleep apnea prohibited work because he slept about three to four hours each night, causing chronic fatigue.  (Doc. 9-4, pp. 18-19).  Mr. Spears testified that he could fall asleep any time which he believed could get him fired.  (Doc. 9-4, p. 19).

Mr. Spears explained that he could sit, stand, or walk for about forty-five minutes without needing adjustments.  (Doc. 9-4, pp. 13-14).  Mr. Spears testified that he had gained a significant amount of weight since his military discharge.  He was 290 pounds and 5'10" tall.  (Doc. 9-4, p. 47).  Mr. Spears tried to lose weight by walking on a treadmill.  (Doc. 9-4, p. 48).  He explained that, since 2005, his "knees buckle[d] from time to time as he walk[ed]."  (Doc. 9-4, p. 48).  Because he struggled to get up and down the stairs of his two-story townhome, Mr. Spears slept on the couch.  (Doc. 9-4, p. 50).

Mr. Spears testified that he had "inflammation on the inside of [his] body," and his "muscles [were] very sore and painful."  (Doc. 9-4, pp. 34-35).  Mr. Spears explained that his joints would swell if he did not take his daily gout medication.  (Doc. 9-4, p. 35).  Mr. Spears stated that his gout medicine "help[ed] to control the

outbreaks but it [did not] necessarily stop the outbreaks." (Doc. 9-4, p. 35). Mr. Spears testified that he had sharp pains in his lower back. (Doc. 9-4, p. 34).

Mr. Spears stated that he was in constant pain because of his fibromyalgia. (Doc. 9-4, p. 16). Mr. Spears testified that many doctors treated him for fibromyalgia over the years, but they did not prescribe medication for his symptoms because "they said they don't have anything to give [him] for it." (Doc. 9-4, p. 16).

Mr. Spears testified that his kidneys were "not functioning normally" and were "very damaged" because of his high blood pressure and diabetes. (Doc. 9-4, p. 32). Mr. Spears explained that he had "to drink lots and lots of water to try to keep them working a lot." (Doc. 9-4, p. 32). Mr. Spears visited his primary care physician once every three months for evaluation of his kidney function. (Doc. 9-4, pp. 32-33).

The ALJ spoke with Mr. Spears's attorney about Dr. Harris's opinion regarding Mr. Spears's ability to work. (Doc. 9-4, p. 24). The ALJ pointed out that Dr. Harris checked severe limitations that Dr. Harris believed kept Mr. Spears from working, but Dr. Harris did not provide objective evidence or narrative support. (Doc. 9-4, pp. 24-26). The ALJ noted that he could not accept Dr. Harris's opinion without support. (Doc. 9-4, pp. 25-26). Mr. Spears's attorney indicated that Dr. Harris may have been confused about how to complete the form. (Doc. 9-4, pp. 25-28).

With respect to past work, Mr. Spears served as a vehicle mechanic in the military from 2001 until 2004.  (Doc. 9-4, pp. 10-11).  Mr. Spears served in the National Guard from 2004 to 2009.  (Doc. 9-4, p. 11).  Mr. Spears also worked as a correction's officer for adult and juvenile males and as a "government contracted armed security officer."  (Doc. 9-4, pp. 11, 52).  As a security officer Mr. Spears "guarded all of the federal businesses [and] federal buildings around the area of Huntsville, Alabama."  (Doc. 9-4, p. 11).  Mr. Spears testified that he stopped working as a security guard because his PTSD caused him to frequently "look[] over [his] shoulder."  (Doc. 9-4, p. 34).  He testified that he could not continue to work in a position that required him to carry a weapon because he did not trust himself, and he did not feel comfortable around the number of people that he had to interact with daily.  (Doc. 9-4, p. 34).  Mr. Spears resigned from his security guard job because he "did not want to make a terrible mistake based upon how [he] [felt] or an assumption that maybe [*sic*] terribly the wrong assumption or the wrong way to feel that would really affect the rest of [his] life."  (Doc. 9-4, p. 36).

Stephanie Malone testified as a vocational expert.  (Doc. 9-4, p. 51).  Ms. Malone stated that Mr. Spears's past work as a security guard and patrol conductor were light exertion jobs.  (Doc. 9-4, p. 52).  Ms. Malone concluded that a hypothetical person with Mr. Spears's age, education, work experience, and mental limitations could not perform the composite jobs described in Mr. Spears's work

history.  (Doc. 9-4, pp. 54-55).  Ms. Malone determined that jobs existed in the national economy for an individual of Mr. Spears's ability, age, education, work experience, and limitations, including a marker, a router, and a garment sorter.  (Doc. 9-4, p. 55).

*Mr. Spears's Supplemental Administrative Hearing*

During Mr. Spears's supplemental administrative hearing on March 19, 2020, the ALJ heard testimony from Mr. Spears and Ms. Malone.  (Doc. 9-3, pp. 44-65). Mr. Spears testified that his condition had not improved.  Mr. Spears's attorney submitted one additional piece of evidence, and he pointed out that Mr. Spears still was being treated for migraines.  (Doc. 9-3, pp. 47-48).

Ms. Malone testified that Mr. Spears's work in the preceding 15 years as a security guard and a patrol conductor were light exertional level.  (Doc. 9-3, pp. 49-50).  Ms. Malone indicated that an individual of Mr. Spears's age, education, history, and limitations would be precluded from performing the work described in Mr. Spears's work history.  (Doc. 9-3, p. 51).  Ms. Malone stated that jobs existed in the national economy that an individual with Mr. Spears's limitations could perform at the unskilled light work level such as a marker, a photocopy machine operator, and a garment sorter.  (Doc. 9-3, pp. 51-52).  Ms. Malone testified that the unskilled light work level jobs she mentioned would not be precluded if the individual had the same limitations, but the individual needed a sit/stand option job and could stand or walk

23

for only four hours in an eight-hour workday with the ability to sit and change positions for a few minutes without being off task.  (Doc. 9-3, p. 53).

Mr. Spears's attorney asked Ms. Malone whether it would be likely that an individual performing the unskilled light work positions that she mentioned would have to walk or stand for more than four hours.  Ms. Malone testified that she could not give a straightforward answer to the question because there were a lot of variables to account for.  (Doc. 9-3, p. 55).  Mr. Spears's attorney asked Ms. Malone how her answer would change if the individual "had to lay down a minimum of two hours a day during two days [in] a normal five-day workweek . . . due to migraines."  Ms. Malone testified that that all work would be precluded.  (Doc. 9-5, pp. 53-54).

## THE ALJ'S DECISION

The ALJ found that Mr. Spears had not engaged in substantial gainful activity since September 30, 2016, the alleged onset date.  (Doc. 9-3, p. 21).  The ALJ determined that Mr. Spears suffered from the severe impairments of osteoarthritis of the lumbar spine, irritable bowel syndrome, obesity, diabetes mellitus II, kidney disease, sleep apnea, depression, and PTSD.  (Doc. 9-3, p. 21).  The ALJ also determined that Mr. Spears's had the non-severe impairments of hypertension, hyperlipidemia, gout, asthma, and migraines.  (Doc. 9-3, p. 21).  Based on a review of the medical evidence, the ALJ concluded that Mr. Spears did not have an impairment or a combination of impairments that met or medically equaled the

severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

(Doc. 9-3, p. 23).

Given these impairments, the ALJ evaluated Mr. Spears's residual functional

capacity.  The ALJ determined that Mr. Spears had the RFC to:

> perform less than the full range of light work as defined in 20 CFR
> 404.1567(b) in that he can occasionally lift and/or carry, including
> upward pulling, twenty pounds and frequently lift and/or carry,
> including upward pulling, ten pounds; he can sit for six hours in an
> eight-hour workday with normal breaks; and he can stand and/or walk
> for six hours in an eight-hour workday with normal breaks.  The
> claimant can occasionally climb ramps and stairs, balance, stoop, kneel,
> and crouch, but should never crawl.  The claimant should not work on
> ladders, ropes or scaffolds; he should not work at unprotected heights
> or around dangerous machinery; and he should perform no commercial
> driving.  The claimant should avoid concentrated exposure to extreme
> cold and heat, wetness, and humidity.  The claimant can understand,
> remember, and carry out short simple instructions.  He can concentrate
> and remain on task for two-hour periods across an eight-hour workday
> and five-day workweek, with customary work breaks.  Any changes in
> the work environment should be infrequent.  The claimant can have
> occasional contact with the general-public, coworkers, and supervisors.

(Doc. 9-3, pp. 25-26).  "Light work involves lifting no more than 20 pounds at a time

with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though

the weight lifted may be very little, a job is in this category when it requires a good

deal of walking or standing, or when it involves sitting most of the time with some

pushing and pulling of arm or leg controls."  20 C.F.R. § 404.1567(b).  "If someone

can do light work . . . he can also do sedentary work, unless there are additional

limiting factors such as loss of fine dexterity or inability to sit for long periods of

time."  20 C.F.R. § 404.1567(b).  "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."  20 C.F.R. § 404.1567(a).

Based on this RFC, the ALJ concluded that Mr. Spears could not perform his past relevant work as a security guard or patrol conductor.  (Doc. 9-3, p. 37).  Relying on testimony from the vocational expert, the ALJ found that jobs existed in significant numbers in the national economy that Mr. Spears could perform, including a marker, photocopying machine operator, and garment sorter.  (Doc. 9-3, p. 38).  Accordingly, the ALJ determined that Mr. Spears was not under a disability as defined by the Social Security Act.  (Doc. 9-3, p. 39).

## STANDARD OF REVIEW

The scope of review in this matter is limited.  "When, as in this case, the ALJ denies benefits and the Appeals Council denies review," a district court reviews the ALJ's "'factual findings with deference'" and his "'legal conclusions with close scrutiny.'"  *Riggs v. Comm r of Soc. Sec.*, 522 Fed. Appx. 509, 510-11 (11th Cir. 2013) (quoting *Doughty v. Apfel,* 245 F.3d 1274, 1278 (11th Cir. 2001)).

A district court must determine whether there is substantial evidence in the record to support the ALJ's factual findings. "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004). In evaluating the administrative record, a district court may not "decide the facts anew, reweigh the evidence," or substitute its judgment for that of the ALJ. *Winschel*, 631 F.3d at 1178 (internal quotations and citation omitted). If substantial evidence supports the ALJ's factual findings, then a district court "must affirm even if the evidence preponderates against the Commissioner's findings." *Costigan v. Comm r, Soc. Sec. Admin.*, 603 Fed. Appx. 783, 786 (11th Cir. 2015) (citing *Crawford*, 363 F.3d at 1158).

With respect to the ALJ's legal conclusions, a district court must determine whether the ALJ applied the correct legal standards. If the district court finds an error in the ALJ's application of the law, or if the district court finds that the ALJ failed to provide sufficient reasoning to demonstrate that the ALJ conducted a proper legal analysis, then the district court must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

## DISCUSSION

### *Mr. Spears's Severe Impairments*

Mr. Spears contends that the ALJ erred at step two by finding that TBI with migraines and fibromyalgia were not severe impairments.  (Doc. 12, p. 14).  Mr. Spears argues that the ALJ "[did] not discuss the tender point testing, opinion evidence, or examinations related to fibromyalgia and disregard[ed] Mr. Spears'[s] complaints of pain and continued treatment for chronic headache[s]."  (Doc. 12, p. 16).  Mr. Spears asserts that the ALJ's error is not harmless because the ALJ did not properly consider the omitted impairments later in the sequential process.  (Doc. 12, p. 15) (citing *Freeman v. Comm'r of Soc. Sec.*, 593 Fed. Appx. 911, 914-15 (11th Cir. 2014); *Gray v. Comm'r of Soc. Sec.*, 550 Fed. Appx. 850, 853-54 (11th Cir. 2013)).

As the Eleventh Circuit has explained, "step two requires only a finding of 'at least one' severe impairment to continue on to the later steps."  *Tuggerson-Brown v. Comm'r of Soc. Sec.*, 572 Fed. Appx. 949, 951 (11th Cir. 2014) (quoting *Jamison v. Bowen*, 814 F.2d 585, 588 (11th Cir. 1987)); *see also Packer v. Comm'r of Soc. Sec.*, 542 Fed. Appx. 890, 892 (11th Cir. 2013) ("[T]he ALJ determined at step two that at least one severe impairment existed; the threshold inquiry at step two therefore was satisfied. Indeed, since the ALJ proceeded beyond step two, any error in failing to find that Packer suffers from the additional severe impairments of degenerative

28

joint disease of the right knee or varicose veins would be rendered harmless."). As noted, based on his review of Mr. Spears's medical records, the ALJ identified eight severe impairments. Therefore, the ALJ's failure to identify other alleged severe impairments at step two is harmless error.

Mr. Spears argues that the ALJ did not consider TBI, migraine headaches, or fibromyalgia in formulating an RFC. (Doc. 15, p. 4). The ALJ's lengthy opinion contradicts the assertion. In discussing the rationale for the RFC that he assigned Mr. Spears, the ALJ explained that there was no medical evidence to support Mr. Spears's contention that he suffered a traumatic brain injury in combat. (Doc. 9-3, p. 32). The ALJ stated:

> The claimant claimed a traumatic brain injury although the medical records are void of such diagnosis or any treatment. He said he passed out when he hit his head inside a truck he was driving. He admitted he was never treated in the Army for such condition. He said he sees his doctor every three month[s] and has never had any surgeries for his complaints.

(Doc. 9-3, pp. 21, 32-33). Substantial evidence in Mr. Spears's medical records supports these findings.[4]

Likewise, in discussing the reasons for Mr. Spears's RFC, the ALJ considered Mr. Spears's visit to the Crestwood Medical Center on August 13, 2016, because of

---

[4] At Mr. Spears's supplemental administrative hearing, his attorney mentioned "water on the brain that they consistently have to drain off." (Doc. 9-3, p. 56). The ALJ was not aware of medical records that substantiated this contention, and the Court has not found any in its review of Mr. Spears's medical records.

his headaches. (Doc. 9-3, pp. 28, 33). The ALJ considered a CT scan of Mr. Spears's head which showed no mass. (Doc. 9-3 p. 29). The ALJ discussed Mr. Spears's treatment record from December 2017 for headaches and a medical record from February 2019 that indicated that Mr. Spears denied severe headaches. (Doc. 9-3, pp. 28, 30). The ALJ's discussion of these medical records is largely consistent with the Court's description of the medical records relating to Mr. Spears's headaches. Those records are relatively sparse, and they indicate that after a neurologist instructed Mr. Spears to stop taking Excedrin and to take two prescribed medicines to treat the headaches, Mr. Spears's internist questioned whether Mr. Spears was adhering to his prescribed medication. (Doc. 9-11, p. 87). Thus, substantial weight supports the ALJ's evaluation of Mr. Spears's headaches as they pertain to his RFC.

With respect to his discussion of Mr. Spears's fibromyalgia as it relates to Mr. Spears's RFC, the ALJ wrote that Mr. Spears's medical records reflected intermittent complaints about fibromyalgia and conservative treatment. The ALJ observed that Mr. Spears was diagnosed with fibromyalgia in 2013, and he worked until 2016. (Doc. 9-3, p. 33). The ALJ noted that although Mr. Spears complained of pain in February 2019, he reported that he was able to walk one mile. (Doc. 9-3, p. 35).

Consistent with these findings, the Court has not located in the administrative record medical records that indicate that Mr. Spears regularly sought treatment for

fibromyalgia.  The most significant reports in the administrative record concerning fibromyalgia are two consultative reports from 2017, one in February from Dr. Baren for a VA benefits application and the other in November from Dr. Mollohan for a Disability Determination Examination.  (Doc. 9-9, pp. 40, 157).  Neither physician treated Mr. Spears.  Dr. Baren reported that Mr. Spears was not being treated for fibromyalgia when she saw him.  (Doc. 9-9, p. 41).  None of the prescription medications that Mr. Spears reported to Dr. Mollohan is used to treat fibromyalgia. (Doc. 9-9, p. 162).  Both physicians found that Mr. Spears complained of pain in most or all of the 18 palpable muscular tender points in the diagnostic criteria for a diagnosis of fibromyalgia.  (Doc. 9-9, pp. 42, 159-60).  Though those complaints of pain in muscular tender points may be indicative of fibromyalgia, Mr. Spears had no other findings, symptoms, diagnostic test findings, or conditions consistent with a diagnosis of fibromyalgia.  (Doc. 9-9, pp. 42-43).  Mr. Spears had normal strength in all extremities, and his sensory perception to touch and pressure was normal in all extremities but his right thumb.  (Doc. 9-9, p. 165).  Dr. Baren indicated that Mr. Spears's fibromyalgia did not impact his ability to work.  (Doc. 9-9, p. 43).  In the narrative portion of her report, Dr. Baren pointed out that Mr. Spears's complaints of sleep disturbances and depression related to his PTSD, not his fibromyalgia. (Doc. 9-9, p. 43).

In sum, if the ALJ's failure to include TBI, migraine headaches, and fibromyalgia in Mr. Spears's list of severe impairments constitutes error, the error is harmless both because it did not prevent the ALJ from moving from step two to step three of the sequential analysis and because the ALJ properly acknowledged and accounted for the medically verifiable impairments of migraine headaches and fibromyalgia in Mr. Spears's RFC. *Tuggerson-Brown v. Comm'r of Soc. Sec.*, 572 Fed. Appx. 949, 951 (11th Cir. 2014) (noting that the ALJ "was required to consider all impairments regardless of severity, in conjunction with one another in performing the latter steps of the sequential evaluation."). Substantial evidence supports an RFC for work at the restricted light level.

### *Evaluation of Medical Opinion Evidence*

Mr. Spears contends that he has a VA disability rating of 100%, and he argues that the ALJ erred because he did not discuss the VA disability determination and the Disability Benefits Questionnaire in his decision. Mr. Spears also contends that the ALJ did not consider the medical evidence on which the VA relied in reaching its disability determination. (Doc. 12, p. 21).

For SSA claims like this one filed after March 27, 2017, an ALJ "will not provide any analysis in [his] determination or decision about a decision made by any other governmental agency … about whether you are disabled, blind, employable, or entitled to benefits." 20 C.F.R. § 404.1504; *see Harner v. Soc. Sec. Admin.*,

*Comm'r.*, 38 F.4th 892, 898 (11th Cir. 2022).  An ALJ "will consider all of the supporting evidence underlying the other governmental agency or nongovernmental entity's decision" that the claimant places in the SSA administrative record.  20 C.F.R. § 404.1504.

The ALJ acknowledged Mr. Spears's disability determination from the VA, (Doc. 9-3, p. 36), but under 20 C.F.R. § 404.1504, the ALJ was not permitted to provide analysis about the VA's decision.  Although it does not appear that the ALJ discussed in his opinion Dr. Baren's evaluation of Mr. Spears's fibromyalgia for the VA disability proceeding, the ALJ was not required to discuss the evaluation; he only had to consider it.  *See Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005) (explaining that, generally, "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision").[5]  The ALJ stated that he "considered the medical opinions and prior administrative medical findings." (Doc. 9-3, p. 26).  Moreover, any error in the ALJ's failure to specifically refer to Dr. Baren's assessment is harmless because Dr. Baren's findings that Mr. Spears did not

---

[5] In *Noble v. Commissioner of Soc. Security*, the Eleventh Circuit explained that under the version of 20 C.F.R. § 404.1504 in place in 2016, a VA disability decision was not binding on the Commissioner, but the Commissioner had to consider the decision and, under binding Eleventh Circuit precedent, had to give that agency decision great weight.  963 F.3d 1317, 1329 (11th Cir. 2020).  The "great weight" rule was an exception to *Dyer*'s general rule and obligated an ALJ to discuss in his decision "another agency's decision finding the claimant disabled."  963 F.3d at 1329.  Because the Eleventh Circuit has held that courts should implement the updated regulations that the Commissioner adopted in 2017, an ALJ no longer may discuss a VA disability determination, and the general rule would appear to apply to supporting evidence underlying a VA determination.

need continuous medication for fibromyalgia and that his fibromyalgia did not affect his ability to work, (Doc. 9-9, p. 40-43), were largely consistent with Dr. Mollohan's opinion which the ALJ discussed at step four, (Doc. 9-3, pp. 33-34). Therefore, there is no basis for remand for the ALJ to expressly discuss Dr. Baren's assessment of Mr. Spears's fibromyalgia.

Mr. Spears argues that the ALJ erred in his consideration of Dr. Harris's opinion evidence. Dr. Harris completed an undated assessment in which he indicated that Mr. Spears had considerable limitations in several areas of functioning. (Doc. 9-12, pp. 123-24). Dr. Harris also wrote a brief letter dated April 19, 2018, in which he opined that Mr. Spears's PTSD and depression precluded him from maintaining employment. (Doc. 9-9, p. 184). Mr. Spears contends that the ALJ substituted his "lay opinion for that of Dr. Harris" and disregarded Dr. Harris's opinions "without substantial evidence to support such omissions." (Doc. 15, p. 7).

Under the applicable 2017 regulations, an ALJ may not defer to or give specific evidentiary weight to a medical opinion but should focus on the persuasiveness of the opinion by considering, among other things, the supportability of the opinion, the consistency of the opinion with objective medical evidence, the source's relationship with the claimant, and the source's field of specialization. 20 C.F.R. § 404.1520(c)(1)-(5); *Matos v. Comm'r of Soc. Sec.*, No. 21-11764, 2022 WL 97144, *4 (11th Cir. Jan. 10, 2022). An ALJ must explain how he considered

supportability and consistency, the two most important factors. 20 C.F.R. § 404.1520(c)(c)(1-2); *Matos*, 2022 WL 97144 at *4. An ALJ may articulate his findings on other factors. 20 C.F.R. § 404.1520(c)(2).

The ALJ found that Dr. Harris's undated "fill in the blank" assessment was neither inherently valuable nor persuasive because it was incomplete, inconsistent with Dr. Harris's treatment records, and unsupported by the record as a whole. (Doc. 9-3, pp. 30-31). The ALJ correctly stated that Dr. Harris indicated Mr. Spears's mental impairments by check marks on the "pre-printed form" and "left all support . . . in the 'clinical findings' portion of [the] form . . . blank." (Doc. 9-3, p. 30). The ALJ found that limitations that Dr. Harris identified in the form were inconsistent with Dr. Harris's treatment records. For example, Dr. Harris indicated that Mr. Spears had a severe impairment in his ability to use judgement, but Dr. Harris's treatment records consistently noted that Mr. Spears's judgement was fair. (Doc. 9-3, p. 31; Doc. 9-11, pp. 116, 136, 164; Doc. 9-12, pp. 25, 42, 69, 82, 119). The ALJ also discussed the inconsistencies he found in Dr. Harris's ratings on the assessment form and Mr. Spears's testimony about his daily activities. (Doc. 9-3, p. 31). Ultimately, the ALJ determined that Dr. Harris's assessment was "undated and unsupported" and "neither probative nor persuasive." (Doc. 9-3, p. 31).

Similarly, The ALJ found the April 19, 2018, letter from Dr. Harris "To Whom It May Concern" neither valuable nor persuasive because Dr. Harris's

opinion that Mr. Spears's depression and PTSD rendered him disabled was inconsistent with Dr. Harris's treatment notes that reflected that Mr. Spears's PTSD and depression symptoms generally were stable with medication and counseling. (Doc. 9-3, p. 31). The ALJ also noted that disability determinations are reserved for the Commissioner. (Doc. 9-3, p. 32) (citing 20 C.F.R. § 404.1527(e)(2)).

Mr. Spears's medical records support the ALJ's findings. For example, on December 7, 2016, Dr. Harris noted that Mr. Spears was receiving outpatient treatment for PTSD and depression and that he had never been hospitalized for these conditions. (Doc. 9-12, p. 79). Mr. Spears exhibited a dysphoric mood and a constricted affect, but he experienced no hallucinations; he was oriented to time, place, and event; and his insight and judgment were fair. (Doc. 9-12, p. 82). Dr. Harris noted that Mr. Spears was receiving treatment for both conditions. (Doc. 9-12, p. 83). When Mr. Spears visited Dr. Harris in August of 2017, Mr. Spears reported that he felt calmer and less depressed. (Doc. 9-12, p. 39). Mr. Spears often denied severe depressive symptoms and described his depression as mild. (Doc. 9-11, pp. 113, 133, 161; Doc. 9-12, p. 22). Records that post-date Dr. Harris's April 2018 letter indicate an uptick in Mr. Spears's depressive symptoms, but Mr. Spears denied hallucinations, and he showed no overt signs of psychosis. (Doc. 9-11, pp. 94, 106, 140). Therefore, substantial evidence supports the ALJ's conclusion that

Dr. Harris's opinion was neither adequately supported by nor consistent with Mr. Spears's treatment records.

### CONCLUSION

For the reasons discussed above, the ALJ's decision rests on substantial evidence, and the ALJ applied proper legal standards. The Court will not reweigh the evidence or substitute its judgment for that of the Commissioner. Accordingly, the Court affirms the Commissioner's decision. The Court will enter a separate final judgment consistent with this memorandum opinion.

**DONE** and **ORDERED** this March 17, 2023.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE